IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **PREMIER ELECTRONICS, L.L.C.** § | |
| *Plaintiff*, § | |
| § | **Civil Action No. 4:19cv57** |
| v. § | **Judge Mazzant** |
| § | **JURY DEMANDED** |
| **VIVINT INC.,** § | |
| *Defendant.* § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Pursuant to the Court's Order and Advisory [Doc 6] dated January 30, 2019, Plaintiff Premier Electronics, L.L.C. ("Premier") files this Plaintiff's First Amended Complaint.

## I.
## PARTIES

**1.** Premier is a Texas limited liability company with its principal office located in Dallas County, Texas. All member of Premier are citizens of the State of Texas.

**2.** Defendant Vivint Inc. ("Vivint") is a Utah corporation which is duly authorized to engage in business in the State of Texas. Vivint has entered a general appearance in this matter by filing an answer and notice of removal.

## II.
## SUBJECT MATTER JURISDICTION & VENUE

**3.** Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of difference states.

**4.** Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Sherman Division of the Eastern District of Texas because a substantial part of the events or omissions giving rise to

the claim occurred in Collin County, Texas, which is located in the Sherman Division of the Eastern District of Texas.

## III.
## SUMMARY OF THE CASE

**5.** This is an action for damages, attorney fees, and injunctive relief arising from Vivint's deceptive sales practices.

**6.** Vivint competes with Premier, selling residential security systems and alarm monitoring services to Premier's existing and prospective customers.

**7.** Premier has a number of bulk-billing security system agreements with developers and home owner associations in the DFW metroplex pursuant to which Premier provides residential security systems and alarm monitoring services to all of the residences within certain developments.

**8.** Vivint's sales agents routinely use false sales pitches, specifically targeting neighborhoods where Premier has exclusive agreements covering the entire development that mislead Premier's customers and prospective customers into believing that the agents represent Premier or are otherwise affiliated with Premier.

**9.** This deception confuses Premier's customers and prospective customers at their doorsteps, often shortly after they have moved into their new homes, winning their interest and trust in a calculated effort to gain access to the customers' homes, to remove Premier equipment, and to install new Vivint equipment in the guise of an "upgrade."

**10.** Although Vivint is fully aware of at least one of Premier's bulk-billing security system agreements with masterplanned communities and the contracts with individual homeowners, Vivint's agents routinely try to persuade Premier's customers to sign new contracts with Vivint, and tortiously interfere with Premier's existing and prospective relations.

11. As of the date of this petition, Vivint agents have already approached more than 1,200 known Premier customers—all with Premier's distinctive yard sign in the front of their homes—and have successfully converted more than 250 of them with their deceptive tactics.

12. Vivint's deceptive practices violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and Premier's common law rights against unfair competition.

13. Premier seeks an injunction barring Vivint's use of deceptive sales tactics, the recovery of Premier's damages, the recovery of Vivint's profits, exemplary damages, and Premier's attorney fees.

## IV.
## FACTS

14. Premier is engaged in the business of installing, maintaining, and monitoring fire, burglary, and alarm systems in the State of Texas.

15. Unlike other security companies, Premier primarily enters into agreements to install, monitor, and service security systems in entire residential developments typically consisting of master-planned communities in the DFW area.

16. LFC Land Company, L.L.C. (the "Developer") is a development company affiliated with Republic Property Group ("Republic") that developed a residential development known as Light Farms located in the Cites of Celina and Prosper, Collin County, Texas ("Light Farms" or the "Development").

17. Light Farms Homeowners' Association, Inc. (the "Association") is a non-profit homeowners' association formed by the Developer to be ultimately be owned and managed by individual homeowners of residences (the "Residences") located in Light Farms for the purpose of owning, operating, and managing the common areas located within the Development.

18. At all relevant times, the Developer controlled the Association.

19. Effective March 25, 2013, Premier, the Developer, and the Association entered into a written Security System Agreement (the "Agreement"). Pursuant to the Agreement, Premier agreed to provide alarm monitoring services as described in the Agreement for all Residences located within the Development. Premier agreed to provide alarm monitoring services for each Residence in the Development at a substantially discounted price based upon the volume of homes Republic had represented to Premier would be included in their ongoing business relationship for its DFW area communities.

20. Pursuant to the Agreement, Premier agreed to install security systems (the "Systems") in all Residences located within the Development as requested by the company constructing the Residences (the "Homebuilder") at a fixed cost per Residence to be paid by the Homebuilder. The Agreement includes specifications for such Systems as well as a limited warranty as further described in the Agreement.

21. Pursuant to the Agreement, the owner(s) of each residence enter into a separate Security Monitoring Agreement with Premier upon completion of the Residence when the security system is first activated.

22. The Association agreed to a bulk billing arrangement pursuant to which the Association would collect Premier's charges for its alarm monitoring service as part of the Homeowner's dues for each Residence. The amount of HOA dues was accordingly calculated to include this charge. Pursuant to the Agreement, Premier would invoice the Association, rather than individual homeowners, for the monthly service fee, and the Association would remit payment to Premier for all homeowners within the Development. This arrangement allowed Premier to provide its monitoring services to the Light Farms homeowners at a substantially discounted price.

23. Pursuant to the Agreement, the term of the bulk-billing Agreement automatically renews for successive thirty-six month renewal terms after the expiration of the initial term, unless terminated by the Association by written notice delivered sixty days prior to the commencement of any renewal term. It is contemplated that the Agreement will continue through build-out of the Development and beyond.

24. This particular business model with pre-designed system specifications mandated by the developer to the builder, a low initial installation fee, and bill collection of alarm monitoring fees by the homeowners' association was all part of a unique business formula developed by Premier. This business formula created a "first to market" advantage for Premier with limitless opportunity for many years.

25. The Agreement expressly permits Association members or Homebuilders to request components and features other than, or in addition to, those specified in the Agreement; however, it further provided that such person would be responsible for the additional cost of the requested modifications to the Systems installed in the Residences.

26. The Agreement requires Premier and each Homeowner to execute a separate Residential-Central Alarm Monitoring Agreement in a specified form.

27. Additional components and features can be selected by each Homeowner under terms and pricing negotiated separately between Premier and the Homeowner. The price for these additional components and features are not subject to the bulk billing arrangement with the Association.

28. After the Agreement was executed, Premier performed all of its obligations under the Agreement. Premier installed Systems complying with the specifications set forth in the Agreement, activated its Monitoring Services and Remote Access Services, billed the

Association for alarm monitoring services, and billed individual Homeowners directly for additional services as specified in the Agreement. Premier fully complied with all warranty and maintenance obligations under the Agreement.

29. Vivint is a competitor of Premier.

30. Unlike Premier, however, Vivint does not commonly enter into agreements with developers or homeowners' associations to provide security systems and alarm monitoring services to entire communities.

31. Instead, Vivint relies upon high-pressure, deceptive sales tactics and door-to-door salespersons to persuade individual consumers to buy Vivint's services and enter into long-term contracts with Vivint.

32. Despite their different marketing approaches, Premier and Vivint sell substantially similar goods and provide substantially similar alarm monitoring services to the same end-user markers.

33. Because of the nature of the products and services they offer, the Texas Private Security Act requires both Premier and Vivint to have a licenses to operate in the State of Texas. Both Premier and Vivint hld such licenses.

34. Because of the risk to homeowners, including the potential to take advantage of homeowners with high-pressure and deceptive sales tactics, the State of Texas prohibits licensees from attempting to sell security and alarm system products and services to homeowners or residents of a home or apartment through direct physical contact, including door to door solicitation unless they comply with the requirements of Rule 35.10 of the Texas Private Security Administrative Rules.

**35.** Rule 35.10 of the Texas Private Security Administrative Rules provides:

Residential Solicitation
A licensee or employee of a licensee who offers or attempts to sell regulated goods or services to a homeowner or resident of a home or apartment through direct physical contact, including door to door solicitation, shall:

(1) Carry a department issued pocket card, or a receipt of registration issued by the department, and present said pocket card or proof of registration for inspection to the homeowner or resident;

(2) Inform the homeowner or resident of the person's name and employer's name;

(3) Provide to the homeowner or resident, at no charge, a document or business card listing the person's name, employer's name, address, phone number, license number, and the department's phone number with instructions on how to contact or file a complaint with the department;

(4) Not approach or solicit a home or residence during any times where a placard is displayed indicating that the homeowner or residential occupant does not wish to be solicited; and

(5) Provide to the local law enforcement agency with primary jurisdiction a written list of registrant that will be engaging in the door to door solicitation of its residents before any solicitation occurs. The licensed company shall update the information provided to the above referenced agency if there are any changes to the list. This notification can be made via fax, email, regular mail, or by hand delivery to the agency. This notification shall include the company name and department issued license number.

**36.** In order to protect its citizens from high-pressure and deceptive sales door to door sales tactics, the City of Celina, Texas, has adopted local ordinances requiring each itinerant vendor, merchant, or peddler taking orders for sale or offering any item or service within the corporate limits of the city to submit to a background check, obtain a permit, and pay a fee of $10 per day. City of Celina Code of Ordinances Article 4.05.

**37.** In 2017, Premier became aware of Vivint salespeople actively soliciting its existing and prospective customers in Light Farms, often using deceptive and misleading sales tactics and doing so without the required city solicitation permit.

38. Alarmed and outraged by Vivint's nefarious acts, Premier informally engaged Vivint to express its concerns. In particular, Shawn Griffith of Premier contacted Garrett Kitch, the director of sales for Vivint.

39. After listening to Mr. Griffith express his concerns about Vivint's unlawful actions, Mr. Kitch chuckled, bragged about the relative size of Vivint compared to Premier, and informed Mr. Griffith that it is part of Vivint's business model to put "mom and pop" companies like Premier out of business. Mr. Kitch further remarked that any illegal acts by Vivint were "built into" its business model and threatened that if Premier brought a lawsuit against Vivint, "we will absolutely crush you."

40. On August 4, 2017, Premier, through its attorney, sent a letter to Vivint notifying Vivint of the existence and key terms of the Agreement, as well as the existing and prospective separate written agreements between Premier and Light Farms Homeowners, demanding that Vivint immediately cease its deceptive and unfair marketing practices which were interfering with Premier's relationships. For several months, Vivint appeared to have discontinued its activities in Light Farms after receiving the letter

41. Vivint operates on a seasonal sales model. Each year, Vivint hires a fresh group of students and transports them to sales locations across the country. As a result, Vivint's sales occur mostly in summer months.

42. Beginning in May 2018, Vivint resumed its high-pressure, deceptive sales tactics in Light Farms and began specifically targeting new homes being built with Premier installed security systems, often before Premier's sales force had explained to these new homeowners the many optional features available through Premier to upgrade the security system in their new home.

43. Upon information and belief, Vivint also appears to have targeted another community with which Premier has a master bulk-billing agreement known as the Hills of Windridge.

44. Vivint's sales agents solicit new Light Farms Homeowners and existing Premier customers in unannounced "cold" door-to-door sales visits to the customers' homes.

45. At the beginning of these sales visits, the agents use deceptive sales pitches that are intended to mislead, and do mislead, Light Farms Homeowners into believing that they represent Premier or are affiliated with Premier or are visiting at Premier's direction or pursuant to Premier's contractual relationship with their homeowners' association.

46. Vivint's agents use these pitches to induce these Homeowners into believing that they have an existing relationship with the agents, to trust them, and to grant the agents entry into their homes. Once inside, having won the customers' trust by this deception, the agents lead the customers to sign Vivint contracts and install Vivint equipment in the mistaken belief that they are merely receiving a duly authorized upgrade of their security equipment.

47. Vivint's deceptive practices injure Premier by causing Premier's customers to listen to their false deceptive sales pitches, allow Vivint's agents entry to their homes under false pretenses, sign Vivint contracts, uninstall their Premier security equipment, replace them with Vivint's equipment, and terminate their Premier contracts.

48. By falsely claiming an affiliation with Premier in its sales to consumers, Vivint further injures Premier by taking for itself the essential benefits of being an affiliate of Premier without paying any royalty or other consideration to Premier for the claim of affiliation.

49. When soliciting Light Farms Homeowners door to door, Vivint did not comply with Rule 35.10 of the Texas Private Security Administrative Rules.

50. Upon information and belief, Vivint never provided to the local law enforcement agency with primary jurisdiction a written list of registrant that will be engaging in the door to door solicitation of the Light Farms Homeowners.

51. When soliciting Light Farms Homeowners door to door, Vivint did not comply with City of Celina Code of Ordinances Article 4.05.

52. Before soliciting Light Farms Homeowners door to door, Vivint and its sales force did not apply for the permits required by City of Celina Code of Ordinances Article 4.05, did not undergo the required background check, and did not pay the required fee of $10 per day.

53. Upon information and belief, a Vivint employee, posing as a Light Farms resident, has infiltrated the social media presence of Light Farms on the "NextDoor" app to target Light Harms homeowners, essentially infiltrating Premier's customer base, and falsely telling homeowners that they have the right to cancel their individual existing agreements with Premier at any time.

54. Vivint's false sales pitches also injure Premier's goodwill and reputation.  Some customers are left with the false belief that Premier is out of business, that Premier has been acquired, that Premier's relationship with the Association has ended or will be ending, and/or that Premier's systems are outdated and vulnerable to burglars.  Others mistakenly assume that Vivint had access to private data the customers had entrusted to Premier, leaving them to question Premier's ability to safeguard their interests.  Yet others understand the false pitch for what it is, but nevertheless reconsider their Premier service.  In many ways, the false sales pitches of Vivint's agents damage Premier's goodwill and reputation as a reliable provider of security services.

55. As a result of Vivint's deceptive practices, a number of Premier customers have confused Vivint's sales agents with Premier representatives and, as a result, have unwittingly allowed the removal of Premier equipment during the initial term of contracts between the homeowner and Premier, thereby finding themselves in overlapping contracts with both Premier and Vivint at the same time. In all of their successful deceptive conversions, customers have retained the Vivint equipment and attempted to terminate their contracts with Premier.

56. Such practices violate statutory and common law prohibitions against the use of false and deceptive statements in commerce. They also violate the security systems industry Code of Ethics and Standards of Conduct which requires that companies "truthfully and clearly identify themselves by name. . .at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

57. The violations and torts alleged in this Complaint have been the subject of public enforcement actions by various state agencies.

58. Vivint has been the subject of more than 232 customer complaints to the Texas Attorney General since 2011. In 2017, the Vivint settled a case with the Texas Attorney General arising from its unlawful door-to-door sales approach without being properly registered.

59. Vivint has faced similar enforcement action in other states. In January 2017, Vivint settled an enforcement proceeding with the Pennsylvania Attorney General that found that Vivint's sales agents had violated the state's consumer protection laws by falsely stating in door-to-door solicitations that they were affiliated with the customers' existing security companies,

that the consumers' existing security providers had gone out of business, that they were purchased and taken over by Vivint, and that the consumers' alarm systems needed to be updated.

60. In short, Vivint's tortious actions toward Premier are part of an unlawful pattern of practice "built into' its business strategy, as Mr. Kitch informed Mr. Griffith.

61. Premier's customers reported the same false solicitations in both 2017 and 2018.

62. In addition, in 2018, a number of Premier customers have reported that Vivint clearly knew of the Agreement between Premier and the Association.

63. A number of new Light Farms Homeowners have reported to Premier that they were misled into believing that Vivint's sales agents were there to activate the security system installed in their new home by Premier under the Agreement.

64. In some cases, Vivint's sales agents falsely informed Premier customers that their existing contracts with Premier had been terminated, had expired, or were unenforceable.

65. In other cases, Vivint's sales agents falsely informed Premier customers that Vivint would take care of their obligations under their existing contracts with Premier and, accordingly, the Homeowners would no longer need to honor the terms of their separate written agreements with Premier for monitoring, cellular alarm transmission services and other modifications to the Systems prescribed by the Agreement.

66. In most cases, Vivint agents falsely referred to Premier equipment as "builder grade," "inferior," "outdated," "vulnerable," "inadequate," and/or "cheap,"and further falsely claimed that Premier could only provide alarm systems and did not have the technology to provide cameras, automation, and other security features which are, in fact, readily available

through Premier. Vivint sales agents also referred to Vivint's own equipment as an "upgrade," the "best available," and/or "one of a kind," although such statements are not true.

67. In order to "lock" these customers into a relationship with Vivint, Vivint agents willfully and intentionally removed Premier equipment from the Residences, and, in every case, installed Vivint's own equipment in order to block Premier's access to the systems.

68. The removal of Premier's equipment and installation of Vivint's equipment prevents Premier from providing the alarm monitoring, cellular alarm transmission, automation, remote access, fire protection and other services to Homeowners, and warranty maintenance and installation services to builders, pursuant to the separate agreements between Premier and such Homeowners and builders.

69. Vivint could have installed its own equipment without removing any of Premier's equipment.

70. Premier notified Vivint in writing that its actions constituted interference with Premier's exclusive rights under the Agreement, and Premier's rights pursuant to their separate agreements with Homeowners. Nevertheless, Vivint persisted in removing Premier equipment from the Residences, and installing Vivint's own equipment.

71. In many instances, Vivint agents told Premier customers that these actions would relieve the Homeowners of any obligations under the Homeowners' individual separate agreements with Premier.

72. All conditions precedent have been performed or have occurred.

## V.
## CAUSES OF ACTION

**Tortious Interference with Existing Contracts with Light Farms Homeowners**

73.     Premier has a series of individual security monitoring agreements and additional service agreements with all, or essentially all, of the Light Farms Homeowners. Vivint willfully and intentionally interfered with those contracts. Vivint's interference proximately caused injury to Premier. Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court. The exact amount of such damages will be determined at a later date.

**Tortious Interference with Prospective Relations with Light Farms Homeowners**

74.     In 2018, Vivint targeted new Light Farms Homeowners whose alarm systems had not yet been activated by Premier. There was a reasonable probability that Premier would have entered into individual security monitoring agreements and additional service agreements with all, or essentially all, Light Farms Homeowners who had not yet signed such agreements with Premier by virtue of its existing Agreement with the Association. Vivint intentionally interfered with these relationships by conduct which was independently tortious or unlawful. Vivint's interference proximately caused injury to Premier. Premier incurred actual damage or loss as a result of such interference in an amount which exceeds the minimum jurisdictional limits of this Court. The exact amount of such damages will be determined at a later date.

**Unfair Competition**

75.     Vivint and Premier compete for a common pool of customers. In connection with Vivint's solicitation of Light Farms Homeowners, Vivint has used in commerce in connection with Vivint's goods and services, false or misleading descriptions of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to

the affiliation, connection, or association of Vivint with Premier or as to the origin, sponsorship, or approval of Vivint's goods, services, or commercial activities by Premier.  Such conduct violates the Lanham Act, 15 U.S.C. § 1125 (a).  Such conduct by Vivint has caused actual damages to Premier in an amount which exceeds the minimum jurisdictional limits of this Court.  Pursuant to 15 U.S.C. § 1117(a), Premier is entitled to compensatory damages, as well as disgorgement of Vivint's profits, Premier's reasonable attorney fees, and costs.  Pursuant to the discretion afforded to the Court under the Act, the Court should consider enhancing these damages in order to fully compensate Premier for its losses.

76.  Given Vivint's historical disregard of its sales agents' false sales pitches and its disregard of Premier's 2017 cease and desist letter, Vivint is likely to continue to engage in such practices unless it is enjoined by this Court from further violations.  Pursuant to 15 U.S.C. § 1116(a), Premier is entitled to a permanent injunction enjoining Vivint from further violations of 15 U.S.C. § 1125(a).

**Exemplary Damages**

77.  The harm for which Premier seeks recovery results from the fraud, malice, or gross negligence of Vivint.  Accordingly, in addition to actual damages, Premier seeks exemplary damages from Vivint pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## VI.
## VICARIOUS AND PARTICIPATORY LIABILITY

**Conspiracy**

78.  Vivint and its sales agents were members of a combination of two or more persons who colluded together to accomplish an unlawful purpose, or a lawful purpose by unlawful means, as described in this petition.  The members of this conspiracy had a meeting of

the minds on the object of their combination and their course of action. One or more of the members of this conspiracy committed an unlawful, overt act to further the object or course of action, as described in this petition. Premier suffered damages in excess of the minimum jurisdictional limits of this Court as a proximate result of the wrongful act underlying the conspiracy. As a result, Vivint is jointly and severally liable for all acts done by any members of the conspiracy in furtherance of their unlawful combination.

**Respondeat Superior**

79.     To the extent that individual Vivint sales agents were employees of Vivint at the time of the acts set forth above, such acts were committed in the course and scope of such employment to further the interests of Vivint. As a result, Vivint is vicarious liable for all acts done by its employees.

**Agency**

80.     To the extent that individual Vivint sales agents were independent contractors of Vivint at the time of the acts set forth above, such acts were committed as agents of Vivint acting in accordance with the express or implied authority given to such agents by Vivint as their principle. As a result, Vivint is vicarious liable for all acts done by its agents.

## VII.
## JURY DEMAND

81.     Pursuant to Rules 38 and 81 of the Federal Rules of Civil Procedure, Premier demands a trial by jury.

## PRAYER

**FOR THESE REASONS**, Premier prays that this Court award judgment in its favor and against Vivint for:

    1.    Actual compensatory damages, including special damages for lost profits and the cost to replace accounts;

    2.    Disgorgement of Vivint's profits;

    3.    Reasonable and necessary attorney fees;

    4.    Exemplary damages;

    5.    Prejudgment interest and post-judgment interest as provided by law; and

    6.    Costs of court.

Premier further prays that this Court grant a permanent injunction against Vivint enjoining Vivint from further violations of 15 U.S.C. § 1125(a). Premier prays for general relief.

Respectfully submitted,

*/s/ John M. Frick*

_____

**John M. Frick**
State Bar No. 07455200
*jfrick@bennettweston.com*

**BENNETT, WESTON, LAJONE & TURNER, P.C.**
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234
Tel:    (972) 662-4901
Fax:    (214) 393-4043

**ATTORNEYS FOR PLAINTIFF
PREMIER ELECTRONICS, L.L.C.**

## **CERTIFICATE OF SERVICE**

On the 1st day of March, 2019, a true and correct copy of this Plaintiff's First Amended Complaint was served on the following attorneys of record via the CM/ECF system:

Joshua J. Bennett
E. Leon Carter
Dorothy Abzanka Culham
**CARTER ARNETT PLLC**
8150 N. Central Ewy., Suite 500
Dallas, TX  75206

*/s/ John M. Frick*
_____
John M. Frick